IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| GLEN PURDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-3529-CV-S-DW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSION OF LAW
IN SUPPORT OF JUDGMENT IN FAVOR OF DEFENDANT**

Plaintiff's claim against the United States of America was tried to the bench on September 13, 14 and 15, 2006. After considering the evidence and the governing law, judgment is entered in favor of Defendant.

The focus of this lawsuit is an incident that occurred while Plaintiff was housed at the United States Medical Center for Federal Prisoners ("USMCFP") in Springfield, Missouri pursuant to a civil commitment under 18 U.S.C. § 4246. On May 7, 2002, while in the main recreational yard at the USMCFP, Plaintiff climbed a tree during a thunderstorm. During the storm, Plaintiff fell or jumped from the tree rendering him a T4 paraplegic with no motor or sensory function below the level of the chest. Plaintiff brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), alleging that Defendant failed to utilize that degree of skill and learning ordinarily used by health care providers in the care of patients like Plaintiff.

I.

Plaintiff has a history of mental problems and suicidal gestures or attempts. In 1996, Plaintiff robbed a bank in Salt Lake City, Utah apparently with the intent to be shot to death by police. Plaintiff was not apprehended at the scene and shortly thereafter, allegedly suffering from guilt over the crime, used the proceeds of the bank robbery to purchase cocaine and attempt an overdose. On September 12, 2000, Plaintiff voluntarily surrendered to the FBI office in Salt Lake City. He was sentenced to a period of twelve months probation for the offense of armed bank

robbery on November 16, 2000.

Plaintiff has long suffered from schizophrenia and beginning in November 2000, he began exhibiting symptoms of Capgras Syndrome.[1]  Around this time Plaintiff had two separate plans or ideas to commit suicide—one with a .22 rifle and the second with a butcher knife.  In January 2001, he attempted an overdose on Zyprexa and his wife's insulin.  In February 2001, while working as a truck driver, he attempted to cut his wrists and overdose.

On March 24, 2001, he was charged with threatening to kill his wife and daughter, violating the terms of his probation.  Plaintiff was sentenced to six months imprisonment on April 5, 2001.  Plaintiff was initially housed at ADX-Florence, Colorado.  While incarcerated at ADX-Florence, Plaintiff apparently attempted to commit suicide by cutting his wrists. On August 14, 2001, Plaintiff was transferred to the USMCFP.

Before Plaintiff's sentence was to expire, an involuntary commitment petition was filed pursuant to 18 U.S.C. § 4246.  The § 4246 petition was filed because Plaintiff was considered to be a danger to his family, or to the property of others.  On November 21, 2001, United States District Judge Ortrie Smith found Plaintiff suffered from mental disease or defect that would create a substantial risk of bodily injury to another person or serious damage to the property of another if he were unconditionally released.  After the expiration of his sentence, Plaintiff remained at the USMCFP pursuant to his involuntary commitment.

Plaintiff was housed at the USMCFP in Springfield, Missouri from August 17, 2001 until May 7, 2002.  During this time, Plaintiff was treated for schizophrenia with Capgras symptoms.  Plaintiff suffered from delusional beliefs that his wife and other family members had been replaced by imposters.  Specifically, he believed that the FBI replaced his wife in an attempt to spy on him and gather information about his past criminal activity.  Plaintiff also believed that a government conspiracy was in place whereby he was prevented from taking his own life.

Plaintiff was initially placed on observation status and remained on this status until late December 2001.  While on observation status, Plaintiff was confined to his room and was not allowed to move freely about the ward or recreational yards.  Observation status is a temporary

---

[1] A Capgras sufferer's primary delusion is that a close relative or friend has been replaced by an impostor, an exact double, despite recognition of familiarity in appearance and behavior.

housing status that nearly all inmates occupy until they choose to be moved, other housing is available, and the inmate's condition warrants a change of housing status.

At the end of December, Plaintiff was moved to Ward 10-C, a semi-open housing unit. On Ward 10-C, inmates may move freely about the ward, but do not have access to the main recreational yard. While on 10-C, Plaintiff was able to be out of his cell several hours per day and to recreate a few hours per day. Although Plaintiff continued to suffer from delusions and other problems at this time, he was moved to 10-C because the treatment team determined he was stable and demonstrating some improvement. Specifically, Plaintiff had agreed to an increase in his anti-psychotic medication and he was no longer paranoid or agitated and was actively participating in the therapeutic process.

On March 19, 2002, Plaintiff was moved to Ward 10-B, an open housing unit, and was employed as an orderly. When moved to Ward 10-B, Plaintiff was initially on ward restriction for seven days to allow the staff to monitor his transition. While on ward restriction Plaintiff did not have access to the main recreational yard but was free to move about the Ward 10-B housing unit. Plaintiff demonstrated no problems adjusting to his new housing status and ward restriction was removed. On Ward 10-B, Plaintiff had access to some, but not all, areas of the prison. As an orderly, Plaintiff cleaned the ward and various offices. While housed in 10-B and working as an orderly, Plaintiff had access to areas and materials that could have been used to inflict self-harm. At no time between March 19 and May 7 did Plaintiff attempt to harm himself or others.

Psychiatrist Dr. Patrick Gariety, M.D. and psychologist Dr. Mark Carter, Ph.D, were primarily responsible for Plaintiff's mental treatment during his commitment at the USMCFP. In addition to therapeutic contacts with Drs. Gariety and Carter, Plaintiff was under regular and constant observation by the medical and prison staff. Dr. Gariety testified that he sees inmates on the ward during his daily rounds. Plaintiff's treatment included the anti-psychotic medication, Seroquel, the anti-depressant medication, Effexor, individualized therapy sessions, and group activities. Under the direction of his treatment team, Plaintiff's dosage of Seroquel was increased gradually. Plaintiff took Effexor from March 8 to 21, but refused to continue because he believed it made him anxious.

Dr. Carter's last progress note for Mr. Purdy was made on April 22, 2002 and indicated that Mr. Purdy continued to suffer from his delusional beliefs. Dr. Gariety's last progress note for Mr.

3

Purdy was made on April 25, 2002 and indicated that Plaintiff's delusions and depression remained problematic and that Mr. Purdy was refusing additional dosage increases of Seroquel and to resume anti-depressant therapy. According to Dr. Gariety, although Plaintiff had not improved in every respect, significant and substantive clinical improvement had occurred from the point when Plaintiff began treatment. On May 2, 2002, Darryl Johnson, M.A., Psychology intern, and Janey Hines, M.A., Neuro-Psychology Practicum Student, conducted a 45 minute clinical interview. Their interview indicates that Plaintiff was pleasant and cooperative, alert and in no acute distress. His attention and concentration appeared normal, his speech was normal in rate and form, and he denied suicidal ideation, though he still suffered from delusions regarding his family members.

On May 7, 2002, after working his morning shift as an orderly, Plaintiff entered the recreational yard and observed a severe thunderstorm approaching. Plaintiff testified that he climbed the tree in the recreational yard during the thunderstorm with the hope that God would strike him with lightning, thereby ending his life. Plaintiff was found in the recreational yard beneath the tree before the storm had passed. Staff immediately moved him inside due to a continuing risk of lightning strikes. Although Plaintiff was not struck by lightning, and in all likelihood fell from the tree, the Court finds his act to be an intentional suicide attempt regardless of whether he intended to end his life by his own affirmative act or by an act of God—being struck by lightning.

II.

Under the FTCA, the United States may be held liable under circumstances where a private person would be held liable to the claimant in accordance with the law of the place where the act or omission occurred—Missouri. 28 U.S.C. § 1346(b); LaFond v. United States, 781 F.2d 153 (8th Cir. 1986). Under Missouri law, Plaintiff has the burden of establishing his claim of medical negligence by showing that 1) Defendant failed to utilize that degree of skill and learning ordinarily used by like healthcare providers; and 2) the failure caused the alleged injuries to the plaintiff. Boehm v. Pernoud, 24 S.W.3d 759, 761 (Mo. App. 2000). There is no presumption of negligence on the part of a physician arising from an adverse result; the plaintiff has the burden to prove negligence. Hurlock v. Park Lane Med. Ctr., Inc., 709 S.W.2d 872, 883 (Mo. App. 1985).

The State of Missouri also requires that mental health patients be treated in the least restrictive environment. Mo. Rev Stat. § 630.115.1(11). Missouri defines "least restrictive

environment" as:

> [a] reasonably available setting or mental health program where care, treatment, habilitation, or rehabilitation is particularly suited to the level and quality of services necessary to implement a person's individualized treatment, habilitation or rehabilitation plan and to enable the person to maximize his functioning potential to participate as freely as feasible in normal living activities, giving due consideration to potentially harmful effects on the person and the safety of other facility or program clients and public safety.

Mo. Rev. Stat. § 630.005(21).

Missouri courts have addressed the tension between strict confinement for safety purposes and increased freedom for treatment purposes by finding the proper degree of supervision to be a "medical judgment made within the confines of the inexact science of psychiatry." M.W. v. Jewish Hosp. Ass'n of St. Louis, 637 S.W.2d 74, 76 (Mo. App. 1982). If there is a basis for a difference of opinion among competent physicians, a physician who uses his best judgment is not negligent even though it may afterward develop that he is mistaken. Haase v. Garfinkel, 418 S.W.2d 108, 114 (Mo. 1967).

Plaintiff was committed to the USMCFP because of the risk he posed to his family. He was treated for his Capgras delusions and any other symptoms that were present or observed by the medical staff. Clearly, Mr. Purdy's injuries could have been prevented by stricter confinement, however in doing so, Defendant would have violated the "least restrictive environment" requirement and failed to utilize an important treatment tool. Gradually moving Mr. Purdy to less restrictive housing status was a decision made within the professional judgment of the treatment team and necessary to their determination of whether he continued to pose a risk to his family or others. This treatment course is not clearly against the treatment recognized as correct by the profession generally. Even Plaintiff's medical experts acknowledged that outside the prison context, suicidal patients are regularly treated on an outpatient basis following a short hospital stay. Indeed, Mr. Purdy himself was treated in this fashion for apparent suicide attempts since his release from the USMCFP. While at the USMCFP, Mr. Purdy was directly observed and treated by doctors and staff over the course of months and was gradually stepped-down to a less-restrictive housing status. The Court finds that the USMCFP treatment team's determination regarding the appropriate housing unit and level of supervision required by Mr. Purdy did not fall below the level of skill commonly

5

exercised by careful and prudent physicians.

The Court also finds that Plaintiff received an adequate frequency of therapeutic contacts. Dr. Gariety testified that in addition to the documented therapeutic contact with Mr. Purdy in the record, medical staff have daily contact with inmates during the normal course of rounds at the facility. Plaintiff's experts—Drs. Blansett and Franks—opined that Mr. Purdy should have been seen by his psychologist and psychiatrist at least two times per week once he was moved to open population. Although the record does not contain documentary evidence of contacts at this frequency, the credible testimony of Dr. Gariety indicates that all inmates are observed daily during rounds. The Court concludes that the treatment team at the USMCFP properly relied on their medical judgment to determine the appropriate frequency of therapeutic contact based on their history with Plaintiff. The Court finds that therapeutic contacts with Plaintiff were within the range of contact frequency recognized as correct by the profession generally.

III.

For the foregoing reasons, the treatment of Plaintiff while committed to the USMCFP did not fall below the appropriate standard of care required by Missouri law. Judgment is hereby entered in favor of Defendant, the United States of America.

IT IS SO ORDERED.

Date: October 19, 2006                                           /s/ DEAN WHIPPLE
                                                                  Dean Whipple
                                                                  United States District Court